Stacey H. Wang (SBN 245195)
Vito Costanzo (SBN 132754)
HOLLAND & KNIGHT LLP
400 South Hope Street 8th Floor
Los Angeles, CA 90071-2040
Telephone: 213-896-2400
Facsimile: 213-896-2450
stacey.wang@hklaw.com
vito.costanzo@hklaw.com

Michael B. Eisenberg (admitted *pro hac vice*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: (212) 513-3529
Facsimile: (212) 385-9010
michael.eisenberg@hklaw.com

Jennifer L. Jonak (SBN 191323)
JONAK LAW GROUP, P.C.
2888 Arline Way
Eugene, Oregon 97403
Telephone: (541) 525-9102
Facsimile: (541) 500-0882
jenny@jonak.com

Attorneys for Plaintiff,
SENSOR ELECTRONIC TECHNOLOGY, INC.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| SENSOR ELECTRONIC TECHNOLOGY, INC., a New York Corporation | ) Case No.: 5:18-cv-05194-LHK ) |
| | ) **PLAINTIFF'S OPENING CLAIM** |
| Plaintiff, | ) **CONSTRUCTION BRIEF** ) |
| vs. | ) ) |
| | ) Complaint Filed:   August 24, 2018 |
| BOLB, INC., a Delaware Corporation, QUANTUM EGG, INC., a Delaware Corporation | ) ) ) |
| Defendants. | ) ) ) |

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

# TABLE OF CONTENTS

Page

I.     RELEVANT LEGAL STANDARDS ...................................................................................1

    1.    The Purpose of Claim Construction ...................................................................1

    2.    The Hierarchy of Claim-Construction Evidence ................................................2

    3.    Application of the Proffered Evidence ................................................................2

    4.    Issues of Law and Fact During Claim Construction ...........................................3

    5.    Indefiniteness under Nautilus ..............................................................................3

II.    DISPUTED CONSTRUCTIONS ......................................................................................3

    1.    "cover" ('965 patent, claim 1) ............................................................................4

    2.    "second compartment defines the volume" ('965 patent, claim 2) .....................5

    3.    "embedded partially relaxed sublayer" ('496 patent, claims 1, 4, 7, 12) .............7

    4.    "dislocation blocking structure" ('496 patent, claims 1, 7, 12) ..........................10

    5.    "graded composition" ('496 patent claims 1, 7, and 12) .....................................12

    6.    "the difference in the molar fractions is selected based on a thickness of at
        least one of the first layer or the second layer" ('468 patent claim 14)...............14

    7.    "the material" ('468 patent claim 26)..................................................................15

    8.    "each period including two layers formed of group III nitride materials . . .
        having molar fractions x [y] and x' [y'], where x>x' [y>y']" ('133 patent claim
        19) ........................................................................................................................17

    9.    "short period superlattice" ('420 patent claims 1, 2, 4, 13, 14)...........................19

    10.   "transparent regions" ('420 patent claims 1 and 13)..........................................21

III.   CONCLUSION .................................................................................................................24

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.,*
566 F.3d 1282 (Fed. Cir. 2009) (*en banc*) ................................................................ 15

*Aircraft Tech. Publishers v. Avantext, Inc.,*
No. C 07-4154 ................................................................................................................ 5

*AK Steel Corp. v. Sollac & Ugine,*
344 F.3d 1234 (Fed. Cir. 2003) .................................................................................. 23

*Am. GNC Corp. v. LG Elecs., Inc.,*
No. 17-CV-01090, 2018 WL 400346 (S.D. Cal. Jan. 12, 2018) ................................... 3

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,*
841 F.3d 1288 (Fed. Cir. 2016) .................................................................................. 10

*ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.,*
908 F.3d 1267 (Fed. Cir. 2018) .................................................................................. 15

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.,*
512 F.3d 1338 (Fed. Cir. 2008) .................................................................................. 16

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC,*
677 F.3d 1361 (Fed. Cir. 2012) .................................................................................. 10

*Cont'l Circuits LLC v. Intel Corp.,*
915 F.3d 788 (Fed. Cir. 2019) ...................................................................................... 4

*In re Downing,*
754 F. App'x 988 (Fed. Cir. 2018) ........................................................................ 16, 17

*Eon Corp. IP Holdings v. Silver Spring Networks,*
815 F.3d 1314 (Fed. Cir. 2016) ........................................................................ 1, 20, 22

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC,*
879 F.3d 1332 (Fed. Cir. 2018) .................................................................................. 22

*Golden Bridge Tech., Inc. v. Apple Inc.,*
758 F.3d 1362 (Fed. Cir. 2014) .................................................................................... 3

*Halliburton Co. v. Walker,*
329 U.S. 1 (1946) ........................................................................................................ 10

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

- ii -

*HTC Corp. v. IPCom GmbH & Co., KG,*
    667 F.3d 1270 (Fed. Cir. 2012).................................................................................14

*Interval Licensing LLC v. AOL, Inc.,*
    766 F.3d 1364 (Fed. Cir. 2014).................................................................................22

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.,*
    430 F.3d 1377 (Fed. Cir. 2005).................................................................................15

*Mangosoft, Inc. v. Oracle Corp.,*
    525 F.3d 1327 (Fed. Cir. 2008)...................................................................................2

*Markman v. Westview Instruments, Inc.,*
    517 U.S. 370 (1996)....................................................................................................3

*Mass. Inst. of Tech. v. Shire Pharm., Inc.,*
    839 F.3d 1111 (Fed. Cir. 2016)...................................................................................9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
    521 F.3d 1351 (Fed. Cir. 2008)...................................................................................1

*Omega Eng'g, Inc., v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003)...................................................................................7

*One-E-Way, Inc. v. Int'l Trade Comm'n,*
    859 F.3d 1059 (Fed. Cir. 2017).................................................................................23

*Phillips v. AWH Corp,*
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ....................................................1, 2, 4, 9

*Poly-Am., L.P. v. API Indus., Inc.,*
    839 F.3d 1131 (Fed. Cir. 2016)...................................................................................5

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.,*
    875 F.3d 1369 (Fed. Cir. 2017)...................................................................................3

*TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.,*
    920 F.3d 777 (Fed. Cir. 2019)..............................................................................10, 11

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
    135 S. Ct. 831 (U.S. 2015)...........................................................................................3

*Thorner v. Sony Computer Entm't Am. LLC,*
    669 F.3d 1362 (Fed. Cir. 2012)..................................................................3, 14, 20, 23

*Twilio, Inc. v. Telesign Corp.,*
    No. 16-CV-06925, 2017 WL 4573371 (N.D. Cal. Oct. 13, 2017) .............................4

*U.S. Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997)...................................................................................1

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

- iii -

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO.: 18-CV-05195-LHK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
    212 F.3d 1377 (Fed. Cir. 2000) ..................................................................................... 7

*Vitronics Corp. v.. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..................................................................................... 9

**Statutes**

35 U.S.C. § 112 .............................................................................................. 3, 10,11, 12

35 U.S.C. § 112(6) ......................................................................................................... 10

**Other Authorities**

M.P.E.P. 2181 ................................................................................................................ 11

M.P.E.P. 2182 ................................................................................................................ 12

Pursuant to Northern District of California Patent Local Rule 4-5 and this Court's Scheduling Order (Dkt. 35), Plaintiff Sensor Electronic Technology, Inc. ("SETi" or "Plaintiff") hereby files its opening claim construction brief.

## I.    RELEVANT LEGAL STANDARDS

### 1.    The Purpose of Claim Construction

Throughout the claim construction process, the focus should be on the ultimate use of the adopted construction – to instruct the jury on the scope and meaning of the asserted claims. *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (explaining that the adopted constructions should "provide the jury with a clear understanding of the disputed claim scope"). That the adopted constructions are used to instruct the jury confirms that the claim-construction process is not an academic exercise. Thus, trial judges are not obligated to "repeat or restate every claim term." *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Instead, the focus should initially be on identifying whether the parties have presented "a fundamental dispute regarding the scope of a claim term." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351, 1360 (Fed. Cir. 2008) (emphasis added). Only the existence of such a "fundamental dispute" creates a "duty [for the court] to resolve it." *Id.*; *see also id.* (holding that trial judges are "not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims").

Moreover, as the Federal Circuit acknowledged in *Phillips v. AWH Corp*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent . . . to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In those cases, "general purpose dictionaries may be helpful." *Id.*

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

### 2.    The Hierarchy of Claim-Construction Evidence

Two different forms of evidence are considered in the claim-construction process: intrinsic evidence, which consists of the claims, specification, and prosecution history of the asserted patents; and extrinsic evidence, which comprises materials that are not part of the asserted patent's public record. *Phillips*, 415 F.3d at 1314-17. As the Federal Circuit has confirmed, the intrinsic record is given primacy in the analysis. *Id.* at 1317. In general, the first step in the analysis is to consider the language of the patents' claims (both asserted and unasserted). *Id.* at 1314. Next, the analysis focuses on the specification of the relevant patent. *Id.* at 1315-17. And the final component of the intrinsic record is the prosecution history. *Id.* at 1317. In addition, district courts are "authorized . . . to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* 1317-18.

### 3.    Application of the Proffered Evidence

As discussed in the preceding section, the scope of evidence potentially touching on claim construction is open ended. That open-ended scope, however, is not an invitation to rely on extrinsic evidence to adopt "definitions considered in the abstract." *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330 (Fed. Cir. 2008). To the contrary, the goal is to give the disputed terms their "ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of invention." *Phillips*, 415 F.3d at 1312-13 (emphasis added). In doing so, the claim language and specification are the primary focus. *Id.* at 1316. Care must be taken, however, not to import limitations from the specification into the claims, which is a "cardinal sin" of patent law. *Id*. at 1319-20; *see also id.* at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"). To avoid improperly constraining the scope of the claims as written, the Federal Circuit has diverged from

the plain and ordinary meaning only "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (citations and quotations omitted); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

### 4. Issues of Law and Fact During Claim Construction

As held in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996), the ultimate resolution of a claim construction dispute is an issue of law. In some cases, however, that ultimate legal issue may be predicated on disputed issues of fact. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (U.S. 2015). Such factual disputes may arise when a district court receives expert opinion on the ordinary and customary meaning. *Id.* at 835.

### 5. Indefiniteness under *Nautilus*

In *Nautilus, Inc. v. Biosig Instruments, Inc.*, the Supreme Court held that a patent is invalid for indefiniteness, under 35 U.S.C. § 112, "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." 572 U.S. 898, 901 (2014). This standard "mandates clarity, while recognizing that absolute precision is unattainable." *Id.* at 910. Indefiniteness is a question of law addressed to the Court. *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1375 (Fed. Cir. 2017). Courts have discretion to address indefiniteness during claim construction or at the summary judgment stage. *See Am. GNC Corp. v. LG Elecs., Inc.,* No. 17-CV-01090, 2018 WL 400346, at *10 (S.D. Cal. Jan. 12, 2018).

## II. DISPUTED CONSTRUCTIONS

The parties have designated ten "most significant" terms as required by N.D. Cal. Patent Rule 4-3(c). Consistent with the Court's practice, only those ten terms are addressed in the

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

- 3 -

1   sections below. *Twilio, Inc. v. Telesign Corp.*, No. 16-CV-06925, 2017 WL 4573371, at *3 (N.D.

2   Cal. Oct. 13, 2017). At the beginning of each section, SETi attempts to identify the dispute(s)

3   between the parties' proposals.

### 1.   "cover" ('965 patent, claim 1)

| Claim Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "cover" | Plain and ordinary meaning. | "a lid or cap that seals the case when closed or attached" |

8   This very first term indicates the stark difference in the parties' approach to claim

9   construction. SETi asserts that the term "cover" is a common English-language word that requires

10  no narrowing or gloss to be utilized by the Court or a jury. In contrast, Defendants replace that

11  single word with two similar terms (lid or cap) and functional language.

12  Following the Federal Circuit's guidance in *Phillips*, 415 F.3d at 1314, the claim-

13  construction analysis begins with the language of the claims themselves. Here, claim 1 recites "a

14  cover <u>configured to selectively close and open the case</u>."[1] Thus, claim 1 recites both the structure

15  and how that structure is configured – "to selectively close and open the case." The claim language

16  in context gives sufficient guidance as to the structure required.

17  The next step in the analysis considers the specification. *Phillips*, 415 F.3d at 1315-16. As

18  the Federal Circuit has emphasized in recent years, although the claims are interpreted "in view of

19  the specification," the claims are not limited based on the specification absent a definition or

20  disclaimer. *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) (citing cases).

21  Thus, district courts have been cautioned regarding the "fine line between construing the claims in

22  light of the specification <u>and improperly importing a limitation from the specification into the</u>

23  <u>claims</u>." *Id.* Here, the specification provides a broad and varied disclosure for the "cover," for

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

24

---

[1]   All emphases herein is added unless otherwise described.

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO.: 18-CV-05195-LHK

which a "cap" is described as merely an example. (Eisenberg Decl. Ex. 1 ('965 patent) at 2:7-8 (using a parenthetical to explain that a "cap" is an example of a "cover"); 3:52-53 (explaining that "[i]n an embodiment, an ultraviolet impermeable cover (also referred to as a cap) . . .")).

Indeed, Defendants' substitution of the simple term "cover" with "lid or cap" renders the scope of the claim, if anything, less clear. In particular, if those alternatives are mere synonyms of identical scope to the claim as drafted, then the substitution is unnecessary. *Aircraft Tech. Publishers v. Avantext, Inc.*, No. C 07-4154 SBA, 2009 WL 3817944, at *9 (N.D. Cal. Nov. 10, 2009) (refusing to swap the claim term "generating" with a synonym). If, however, Defendants' proposal is intended to curtail claim scope, no support is provided in either the specification or prosecution history of the '965 patent. To the contrary, as discussed above, the specification identifies a "cap" as an example of a "cover." And the term lid is absent from the intrinsic record.

Similarly, Defendants' attempt to graft a function requirement – "that seals the case when closed or attached" – should be rejected. As an initial matter, the claim itself sufficiently identifies the capabilities of the "cover" – to "selectively open and close the case." More importantly, the word "seal" was never used by the applicant in either specification or prosecution history of the '965 patent to describe the function of the cover. In short, there can be no evidence to meet the high standards for lexicography or disavowal (*see Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016)), based on the term "seal," which is absent from the relevant sources.

### 2. "second compartment defines the volume" ('965 patent, claim 2)

| Claim Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "second compartment defines the volume" | Plain and ordinary meaning, or in the alternative, "the volume includes the second compartment" | Indefinite<br>In the alternative:<br>"only the second compartment is exposed to ultraviolet radiation from the at least one ultraviolet radiation source" |

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

- 5 -

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

For the second term – "second compartment defines the volume" – the parties' primary dispute is whether its scope can be determined with reasonable certainty. Secondarily, the parties dispute whether the alleged function of the "second compartment" limits the claim's scope.

Again, the proper starting point is the language of the relevant claims. Here, four passages from claims 1 and 2 provide the proper context for construction:

> an ultraviolet radiation containing <u>case</u> configured to enclose a <u>volume</u> corresponding to a flowable liquid product[;]

*          *          *

> <u>a first compartment</u> configured to store a first portion of the flowable liquid product;

> <u>a second compartment</u> configured to store a second portion of the flowable liquid product, wherein the second compartment includes a cover at least partially formed by an ultraviolet transparent material, and wherein **<u>the second compartment defines the volume</u>** <u>such that the at least one ultraviolet radiation source is configured to generate ultraviolet radiation for disinfecting the second portion of the flowable liquid product through the ultraviolet transparent material</u>,

> wherein the first compartment and the second compartment are both located within an interior region of the case.

Focusing on the structural recitations, claim 2 requires a <u>case</u> enclosing a <u>volume</u>, with <u>two compartments</u> located within the volume. The disputed language (bolded above in context), explains that the second compartment comprises a portion of the volume that is configured to receive disinfecting ultraviolet radiation. To this point, except for the use of the word "only," Defendants' alternative construction is consistent with the recitation in context. The relevant dispute, therefore, is whether claim 2 requires the radiation to be exclusive to the second compartment. It does not.

While the language of claim 2 specifically links the second compartment to the radiation, nothing in the claim language itself excludes radiation from the remainder of the volume. Indeed, claim 7, which depends from claim 2 and uses the transitional phrase "comprising", specifies that the first portion of the product (*i.e.*, the portion within the first compartment) can be disinfected by

- 6 -

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

1  radiation. Claims 2 (when viewed in the context of claim 7), therefore, provides a positive

2  requirement that applies to <u>at least</u> the second compartment. *Vehicular Techs. Corp. v. Titan Wheel*

3  *Int'l, Inc.*, 212 F.3d 1377, 1383 (Fed. Cir. 2000) ("A drafter uses the term 'comprising' to mean 'I

4  claim at least what follows and potentially more.'"). Instead, Defendants seek to import a counter-

5  textual negative limitation into the claims, which should be rejected. *Omega Eng'g, Inc., v. Raytek*

6  *Corp.,* 334 F.3d 1314, 1323 (Fed. Cir. 2003) (holding that a disclaimer or lexicography are

7  required to import a "negative limitation" into the claims).

8         Moreover, nothing in the specification defines the second compartment as the only

9  structure that receives radiation. The exemplary

10  embodiment shown in figure 2B (reproduced to the right)

11  depicts a container (40) having a first compartment (24)

12  and a second compartment (26). (Eisenberg Decl. Ex. 1 at

13  6:55-7:21). The ultraviolet source (4) is described as

14  providing radiation to the second compartment (26). (*Id.*

15  at 7:22-35.) And the specification further explains that

16  "<u>any portion</u> of the second compartment [26] can be

17  fabricated using an <u>ultraviolet transparent material</u>."(*id.* at

18  7:18-21). The specification, therefore, does not limit the radiation to the second compartment.



19     **3.   "embedded partially relaxed sublayer" ('496 patent, claims 1, 4, 7, 12)**

| Claim Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| [wherein at least one of the contact semiconductor layers includes an] "embedded partially relaxed sublayer" | "The p-type contact semiconductor layer and/or the n-type contact semiconductor layer incorporates within that layer a semiconductor sublayer that includes dislocations that reduce stress" | "a sublayer that includes dislocations that reduce stress and is surrounded by the layer it is incorporated into" |

       The parties agree that an "embedded partially relaxed sublayer" is a sublayer that includes

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

1  dislocations to reduce stress. The remainder of their constructions, however, differ. SETi's

2  construction seeks to provide context for the jury by explaining where the recited sublayer is

3  embedded based on the express claim language. Defendants, in contrast, seek to import a narrow

4  meaning of embedded – that it is "surrounded" by the layer it is incorporated into.

5       SETi asserts that referring to the p-type/n-type semiconductor contact layers provides

6  helpful context for the jury from the claim language itself:

7       an n-type contact semiconductor layer located on the first side of the light generating
         structure;

8       a p-type contact semiconductor layer located on the second side of the light
         generating structure, <u>wherein at least one of the contact semiconductor layers</u>

9       <u>includes an embedded partially relaxed sublayer</u>.

10  More specifically, the necessary relationship between the p-type/n-type semiconductor layers and

11  the "embedded partially relaxed sublayer" is expressly addressed, *i.e.*, the latter "includes" the

12  former. SETi's construction explains that requirement using the description "incorporates within."

13       SETi's construction is also consistent with the exemplary descriptions in the '496 patent.

14  For example, the embodiment depicted in figure

15  7 (reproduced to the right) shows a partially

16  relaxed contact semiconductor layer (18) and a

17  p-type contact semiconductor layer (28). The

18  corresponding portion of the specification

19  explains that the "partially relaxed p-type

20  contact semiconductor layer 18 . . . [is] shown

21  <u>embedded in the p-type contact semiconductor layer 28</u>." (Eisenberg Decl. Ex. 2 at 7:60-63.) A

22  similar description is provided of a "partially relaxed n-type contact semiconductor layer 22B

23  embedded within the n-type semiconductor layer 22A [in figure 14]." (*Id.* at 11:45-51.)

24       The portion of Defendants' construction interpreting the word "embedded" to mean



PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO.: 18-CV-05195-LHK

"surrounded by the layer it is incorporated into" should be rejected as inconsistent with the intrinsic record. More specifically, nothing in the claims, specification, or prosecution history indicate that an "embedded" layer must be "surrounded." Indeed, that word "surrounded" is never used within the intrinsic record to describe the invention. Instead, the portion of the prosecution history cited by Defendants (Dkt. 55-1 at 15 (citing Amend. of May 18, 2017 at 12-14)), states that the prior art's disclosure of "a separate relaxation enhancement layer" was insufficient. (Eisenberg Decl. Ex. 3 ('496 File History- Amend. of May 18, 2017) at 13.) Distinguishing the prior art as disclosing a "separate" layer is insufficient to act as a "clear and unmistakable" disclaimer of every form of embedding other than being "surrounded." *See Mass. Inst. of Tech. v. Shire Pharm., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016). Moreover, as the Federal Circuit has cautioned "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. That caution has direct application here, as Defendants' proposal would exclude preferred embodiments, which "is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics Corp. v.. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (citing cases).

Finally, both parties rely on extrinsic evidence. (Dkt. 55-1 at 15.) Such evidence "can shed useful light on the relevant art," but is "less significant than the intrinsic record." *Phillips*, 415 F.3d at 1317. Importantly, extrinsic evidence should not be used to "change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history.'" *Id.* (citations omitted). Here, rather than being a helpful explanation of the term embedded as used in the '496 patent, Defendants' citations seek to improperly alter that term's meaning, and therefore, should be rejected.

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

### 4.   "dislocation blocking structure" ('496 patent, claims 1, 7, 12)

| Claim Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "dislocation blocking structure" | Should this element not be found to be a means-plus-function limitation (as asserted by Plaintiff): "an epitaxially grown semiconductor layer having substantially fewer dislocations at a first side than at a second side"<br><br>or<br><br>Should this element found to be a means-plus-function limitation (as asserted by Defendant): the only possible functional language is "dislocation blocking," which requires no construction. Corresponding structures are disclosed at 8:1-4; 8:4-8; 8:9-19; 8:20-23; 8:37-41; 9:4-20; 9:21-40; 9:55-60; 10:2-11; 10:20-11:3; 11:4-21; 11:51-61; Figs. 7-11, and 14 and includes equivalents thereof. | This term is governed by 35 U.S.C. § 112(6).<br><br>**Function:** blocking dislocations<br><br>**Structure:** a layer including alternating compressive and tensile sublayers, as disclosed in the specification at 8:1-9, 8:20-23, 8:37-41, 9:4-40, 9:55-60, 10:2-11, 10:20-11:3, and 11:51-61 and Figs. 7, 8, 9A, 9B, 10A, 10B, 11A, 11B, and 14. |

The primary dispute between the parties is whether the term "dislocation blocking structure" is a means-plus-function term under 35 U.S.C. § 112, ¶ 6. To the extent that the recitation is so limited, a second dispute is whether the claims are limited to a single corresponding structure as asserted by Defendants.

Congress enacted § 112, ¶ 6 in reaction to *Halliburton Co. v. Walker*, 329 U.S. 1 (1946), which invalidated a claim that "describe[d] th[e] most crucial element in the 'new' combination in terms of what it will do rather than in terms of its own physical characteristics or its arrangement in the new combination apparatus." *Id*. at 9; *see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1295 (Fed. Cir. 2016). The *quid pro quo* for permitting the use of that claim form was limiting the claims to the corresponding structures in the specification and equivalents thereof. *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1367 (Fed. Cir. 2012).

As a procedural matter, the analysis begins with a rebuttable presumption that § 112, ¶ 6 does not apply where, as here, the word "means" was not used. *TEK Glob., S.R.L. v. Sealant Sys.*

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

- 10 -

*Int'l, Inc.*, 920 F.3d 777, 785 (Fed. Cir. 2019) (citation omitted). Rebuttal requires a showing that the "claim term fails to 'recite sufficiently definite structure.'" *Id.* That analysis is conducted based on the intrinsic record and, if necessary, extrinsic evidence. *Id.*

Starting with the claim language, that the recitation is structural is supported by the recitation in context – "a dislocation blocking structure . . ., wherein the dislocation blocking structure includes a graded composition that changes from a first side of the dislocation blocking structure to a second side thereof." Thus, rather than using a generic placeholder, claim 1 recites specific details of the recited structure.

The specification also supports treating this recitation as structural rather than functional. In particular, when describing the "dislocation blocking structure," the specification separately discussed the type of structure (*e.g.*, a "p-type dislocation blocking structure") and the function thereof ("prevent dislocations present in the partially relaxed contact semiconductor layer 18 from propagating into the light generating structure 14"):

> FIG. 5 shows a schematic of an illustrative light emitting heterostructure 12A according to an embodiment. The light emitting heterostructure 12A includes a light generating structure 14, an adjacent p-type dislocation blocking structure 16A, and a partially relaxed p-type contact semiconductor layer 18 . . . .In the light emitting heterostructure 12A, the dislocation blocking structure 16A can be configured to prevent dislocations present in the partially relaxed contact semiconductor layer 18 from propagating into the light generating structure 14.

(Eisenberg Decl. Ex. 2 at 6:45-60.)

In addition, the prosecution history shows that the Examiner treated this recitation as structural rather than as purely functional under § 112, ¶ 6. In particular, when applying the Kang reference, the Examiner did not assess whether that reference disclosed the same or equivalent structure to that disclosed in the application, but instead simply noted the disclosure of "a dislocation blocking structure 130." (Eisenberg Ex. 4 (Office Action of March 1, 2017) at 8); *see also* M.P.E.P. 2181 (explaining how an examiner is to determine whether § 112, ¶ 6 is invoked);

- 11 -

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

1  M.P.E.P. 2182 (explaining that when § 112, ¶ 6 is invoked, examination requires an analysis of the

2  corresponding disclosed structure). Instead, the Examiner's analysis was limited to identifying the

3  use of the phrase "dislocation blocking structure" in the abstract Kang to identify layer 130.

4  (Eisenberg Ex. 4 at 7.)

5      Extrinsic evidence also supports treating this recitation as structural. For example, U.S.

6  Application 2008/0054294 (Lai) uses the term to identify a specific type of semiconductor

7  structure. Consistent with that description, Professor DenBaars explains in his declaration that the

8  claim recitation would have been understood by a person having ordinary skill in the art to refer to

9  a known class of semiconductor structures. (DenBaars Decl. ¶ 13-18.)

10     To the extent that Defendants are correct that § 112, ¶ 6 applies, the proposed construction

11  should still be rejected as identifying an overly narrow identification of corresponding structure. In

12  particular, Defendants assert that the corresponding structure must include "alternating

13  compressive and tensile sublayers." (Dkt. 55-1 at 15.) Rather than being limited to only such

14  alternating layers, the specification of the '496 patent discloses alternate structures, including sets

15  of layers having "tensile and compressive stresses [that] can be substantially constant" (Eisenberg

16  Ex. 2 at 9:36-40); incorporating "patterning" (*id.* at 10:20-34); or using "partially relaxed

17  sublayers" (*id.* at 11:4-21).

18     **5.   "graded composition" ('496 patent claims 1, 7, and 12)**

19

| Claim Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "graded composition" | "The composition of the dislocation blocking structure changes across its thickness" | "composition that gradually and monotonically changes from one side to the opposite side" |

22     Consistent with many of the parties' disagreements, the dispute here is whether the term

23  should be construed in the context of the claims, specification, and prosecution history as SETi

24  asserts, or by importing two additional limitations (*i.e.*, "gradually" and "monotonically"), as

- 12 -

1    Defendants propose.

2         Here again, the starting point is the claim language itself, which provides clear guidance on

3    the scope and meaning of the disputed term. In particular, the disputed recitation is not merely

4    "graded composition," but instead "a graded composition <u>that changes from a first side of the</u>

5    <u>dislocation blocking structure to a second side thereof</u>." Thus, the express claim language defines

6    the nature of the change based on the dislocation blocking layer's first and second sides. That view

7    is further supported by the dependent claims (*e.g.*, dependent claim 2) which explains that a

8    "dislocation blocking structure" having a "graded composition" includes "a plurality of tensile

9    sublayers alternating with a plurality of compressive sublayers."

10        Similarly, the specification uses the term "graded" to broadly describe variations in

11   composition between the first and second sides of a layer. (Eisenberg Ex. 2 at 11:67-12: ("the

12   graded layer 60 can comprise a composition that varies from a composition of an adjacent layer,

13   such as the dislocation blocking structure 16D, located on one side, to a composition of the light

14   generating structure 14 located on the opposing side.").) That the change is not limited to a

15   specific form of variation is confirmed throughout the specification. (*Id.* at Figs. 9A (reproduced to

16   the right); 9B; 9:21-40; *see also id.* at 12:4-10 ("The

17   composition grading can be linear or parabolic, with a

18   grading gradient selected to minimize stresses and/or

19   maximize polarization doping."); *id.* at 12:22-29 ("In

20   general, the V/III ratio can be utilized to lower a gradient of

21   the lattice constant at a heterojunction or a graded junction as compared to a gradient lattice

22   constant that would otherwise be obtained without utilizing variations in the V/III ratio during the

23   epitaxial growth.").)

24        Defendants' proposed requirement that the change occur "gradually and monotonically" is

116A

| Tensile Layer     | 136C |
| Compressive Layer | 134C |
| Tensile Layer     | 136B |
| Compressive Layer | 134B |
| Tensile Layer     | 136A |
| Compressive Layer | 134A |

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO.: 18-CV-05195-LHK

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

inconsistent with the claim language and specification of the '496 patent. As to the word "gradually," the specification never uses that term to provide a lexicographic definition of the term "graded composition." Instead, the only uses of the word "gradually" in the specification refer to the change in stress rather than composition. (Eisenberg Decl. Ex. 2 at 9:34-40 ("Alternatively, <u>the stress can gradually change</u> between adjacent layers (e.g., by growing layers having a graded tensile or compressive stress). Furthermore, <u>the tensile and compressive stresses</u> can be substantially constant between periods of the dislocation blocking structures 116A, 116B or <u>can gradually change</u> from period to period.").)

In contrast, the word "monotonically" is entirely absent from the intrinsic record, rendering the imposition of that requirement unsupportable. As discussed above, the specification broadly describes the type of changes that fall within the scope of the term "graded composition," rendering improper Defendants' attempt to impose limitations. *Thorner*, 669 F.3d at 1365.

6.    **"the difference in the molar fractions is selected based on a thickness of at least one of the first layer or the second layer" ('468 patent claim 14)**

| Claim Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "the difference in the molar fractions is selected based on a thickness of at least one of the first layer or the second layer" | Plain and ordinary meaning. | Indefinite (both apparatus and step of making apparatus) |

Rather than the scope and meaning of this claim term, the primary dispute between the parties is whether it is improper to recite an apparatus claim in terms of process steps. Defendants' position should be rejected as contrary to law.

Under Federal Circuit law, a claim may be held invalid if it is directed to "hybrid subject matter." *HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1274 (Fed. Cir. 2012). That doctrine, however, is a narrow one that applies only when the claim as properly construed fails to provide notice as to the requirements to establish or avoid infringement. *Id.* at 1277 (explaining

- 14 -

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005)). In particular, when an apparatus is recited both in terms of its <u>structure</u> and based on its <u>method of use</u>, the resulting claim scope is ambiguous as to whether the structure itself infringes or instead infringement requires the product to be used in a specific way. That doctrine, however, has no application here.

Rather than an improper hybrid claim, claim 14 properly recites the apparatus in "product-by-process" form. *Abbott Labs. v. Sandoz, Inc.,* 566 F.3d 1282, 1293 (Fed. Cir. 2009) (*en banc*) ("this court clarifies that the inventor <u>is absolutely free to use process steps to define this product</u>"). A product-by-process recitation describes a structure in terms of a method of making. *ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*, 908 F.3d 1267, 1276 (Fed. Cir. 2018). Infringement turns on whether the resulting product <u>was made</u> by that process (*id.*), and therefore, no ambiguity exists regarding the necessary predicates to infringement.

Applying the relevant law here, the determinative issue is whether the disputed term recites a method of using a completed product (*i.e.*, an improper hybrid claim) or instead recites a process for making a product (*i.e.*, a product-by-process claim). Based on Defendants' own view of claim 14, the claim recites a method of making, and therefore, does not fall within the category of improper hybrid claiming.

### 7.  "the material" ('468 patent claim 26)

| Claim Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "the material" | Refers back to the recitations: "a first layer composed of a material" and "a second layer composed of a material" for antecedent basis, i.e., the first layer and second layer are both aluminum gallium nitride. | Indefinite |

Much like the preceding term, the primary dispute here is indefiniteness. Rather than absolute certainty, the controlling standard for indefiniteness is whether the "claims, read in light of the specification . . ., and the prosecution history, fail to inform, with reasonable certainty, those

- 15 -

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. The issue, therefore, is whether those sources sufficiently clarify the identity of "the material" of dependent claim 26.

Here, the relevant claims provide substantial guidance. In particular, independent claim 11 (from which claim 26 depends) recites in relevant part:

> a dislocation bending structure . . . comprises a means for causing at least some dislocations propagating from the substrate to at least one of bend or annihilate, prior to reaching the active region, and wherein the means for causing includes a plurality of non-overlapping periods, wherein each period includes:

> a first layer composed of <u>a material including an element</u>; and

> a second layer composed of <u>a material including the element</u>.

Thus, claim 11 twice introduced the claim term "material" using the indefinite article "a" to introduce the layers within the dislocation bending structure. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008) (explaining the use of definite and indefinite articles for purposes of providing antecedent basis).

The alleged lack of clarity apparently relied upon by Defendants is dependent claim 26's use of the definite article "<u>the</u>" to introduce the further limitation "wherein the material is aluminum gallium nitride and wherein the element is aluminum." In other words, by using the definite article "the," Defendants assert that it is unclear which of the two recitations "a material" claim 26 refers to for antecedent basis. An alleged lacks of antecedent basis, however, can be resolved based on the intrinsic record. *See In re Downing,* 754 F. App'x 988, 996 (Fed. Cir. 2018). Based on the claim language itself, the most natural reading of claims 11 and 26 together is that the first and second layers are <u>both</u> comprised of aluminum gallium nitride, *i.e.*, they comprise "the material . . . aluminum gallium nitride."

Support for this conclusion is provided throughout the '468 patent. Indeed, any purported lack of clarity is immediately resolved by the Abstract, which explains that "[t]he dislocation bending structure can include a plurality of layers <u>with adjacent layers being composed of a</u>

- 16 -

1    material, but with molar fractions of an element in the respective material differing between the

2    two layers." (Eisenberg Ex. 5 at Abstract.) In particular, the indefinite article "a" introduces "a

3    material" of multiple adjacent layers. *Id.*; *see also id.* at 4:27-28 ("adjacent layers in the dislocation

4    bending structure 26 can be composed of different compositions of a [*i.e.*, the same] material"); *id.*

5    at 7:5-7 ("In an embodiment, the layers of dislocation bending structure 26 comprise $Al_xGa_{1-x}N$,

6    with different molar fractions of Al, X, for adjacent layers.").

7        **8.**    **"each period including two layers formed of group III nitride materials . . .**
          **having molar fractions x [y] and x' [y'], where x>x' [y>y']" ('133 patent claim 19)**

| Claim Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "each period including two layers formed of group III nitride materials . . . having molar fractions x [y] and x' [y'], where x>x' [y>y']" | "The first [second] superlattice includes a repeating pattern of pairs of layers, each layer includes nitrogen, aluminum and another group III element, and the repeating pattern includes repeating the same higher/lower aluminum molar fraction in each pair" | Indefinite |

14            For terms 6 and 7 above, SETi undertook to determine the specific indefiniteness issue

15    raised by Defendants. Here, however, the precise nature of Defendants' position remains unclear.

16    The following analysis, therefore, focuses on SETi's proposal.

17            Here again, the starting point for claim construction is the relevant claim language:

18        a first superlattice structure located on the buffer layer, wherein the first superlattice
        structure is formed of a plurality of periods, each period including two layers
19            formed of group III nitride materials including aluminum and having molar
        fractions x and x', where x>x';

20        a second superlattice structure located on the first superlattice structure, wherein the
21            second superlattice structure is formed of a plurality of periods, each period
        including two layers formed of group III nitride materials including aluminum and
22            having molar fractions y and y', where y>y'[.]

23    Thus, the claim itself refers to multiple pairs of layers as comprising "a plurality of periods." The

24    layers within each period are described as having differing molar fractions of aluminum, but the

- 17 -

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

1   same repeating molar fractions of aluminum between periods.

2   The concept of a molar fraction is further clarified by the following passage from the

3   specification of the '133 patent:

4   Group III nitride materials comprise one or more group III elements (e.g., boron
    (B), aluminum (Al), gallium (Ga), and indium (In)) and nitrogen (N), such that

5   $B_WAl_XGa_YIn_ZN$, where $0 \leq W, X, Y, Z \leq 1$, and $W+X+Y+Z=l$. The molar fractions
    given by W, X, Y, and Z can vary between the various layers of the

6   heterostructure 10.

7   (Eisenberg Decl. Ex. 6 at 6:21-24.) In particular, the relevant materials include nitrogen (N) and

8   one or more elements from Group III of the periodic table ("boron (B), aluminum (Al), gallium

9   (Ga), and indium (In)"). Together, the number of atoms of all four Group III elements is equal to

10  the number of atoms of nitrogen (N), which is referred to as equal to 1. The subscripts W, X, Y,

11  and Z, therefore, refer to the fraction of atoms within a layer that are boron, aluminum, gallium, or

12  indium relative to the total number of Group III atoms.

13  Thus, the formula $B_WAl_XGa_YIn_ZN$ characterizes the members of the Group III Nitrides.

14  Applying this description to the above reproduced claim language, for the layers of "first

15  superlattice structure," the general subscript X is replaced by the specific values x and x' to

16  indicate that the repeating layers have higher and lower aluminum content relative to total Group

17  III content. And for the "second superlattice structure," the general superscript X is replaced by the

18  specific values y and y' to again indicate that the repeating layers have higher and lower aluminum

19  content relative to total Group III content. Exemplary descriptions corresponding to this

20  interpretation are provided in the '133 patent. (Eisenberg Decl. Ex. 6 at 7:11-19 (describing a "first

21  superlattice structure" as repeating pairs of layers based on the formulas $Al_xGa_{1-x}N$ and $Al_{x'}Ga_{1-}$

22  $_{x'}N$); 7:38-44 (describing a "second superlattice structure" as repeating pairs of layers based on the

23  formulas $Al_yGa_{1-y}N$ and $Al_{y'}Ga_{1-y'}N$).

24

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

- 18 -

9.   **"short period superlattice" ('420 patent claims 1, 2, 4, 13, 14)**

| Claim Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "short period superlattice" | "A semiconductor layer with a plurality of barrier sublayers alternating with a plurality well sublayers, where the barriers are thin enough to provide carrier movement through the layer." | "a superlattice having a few-monolayer-thick wells and barriers, in which the barriers are thin enough that carriers tunnel through them" |

The parties agree that a short period superlattice is made up of wells and barriers. Rather than the precise nature of the layers, the dispute between the parties relates to Defendants' request to adopt narrow limits on the thicknesses of those layers.

Rather than the specific dimensions, the focus of the claimed short period superlattice is on the properties of two different types of regions within the barriers:

> a short period superlattice (SPSL) semiconductor layer, wherein a composition of at least one barrier in the SPSL semiconductor layer varies along lateral dimensions of the at least one barrier such that a lateral cross section of the at least one barrier includes:
>
> a set of transparent regions having a first characteristic band gap . . .; and
>
> a set of higher conductive regions having a second characteristic band gap[.]

In other words, the defining characteristic of the barrier is the balance between its interaction with light (as reflected in the recitation "transparent regions") and its interaction with charge carriers (as reflected in the recitation "conductive regions").

This focus is confirmed throughout the specification of the '420 patent. For example, the Abstract states:

> The layer can comprise a short period superlattice, which includes barriers alternating with wells. In this case, the barriers can include both transparent regions, which are configured to reduce an amount of radiation that is absorbed in the layer, and higher conductive regions, which are configured to keep the voltage drop across the layer within a desired range.

(Eisenberg Decl. Ex. 7 at Abstract; *see also id.* at 5:62-6:1.) In other words, the material properties within the barrier layer are varied to emphasize two properties, conductivity and transparency:

Holland & Knight LLP
400 South Hope Street 8ᵗʰ Floor
Tel: 213.896.2400
Fax: 213.896.2450

In particular, the inhomogeneities will result in lower bandgap regions, which become places of charge localization and form a set of <u>higher conductive regions of carrier conductive channels in the semiconductor layer. These higher conductive regions have an improved vertical conductivity</u> over that of a substantially homogenous layer of the material. Additionally, the inhomogeneities also will result in high band gap regions, which form <u>a set of at least partially transparent regions within the layer, each of which has an improved vertical transparency</u> over that of a substantially homogenous layer of the material.

(*Id.* at 8:38-48.) These conflicting properties are depicted, for example in figures 7 and 9 through 11, wherein increasing the area dedicated to conductive regions also increases absorption and thereby decreases transparency. (*See also id.* at 9:47-52.)

Rather than address the nature of the short period superlattice in the context of the '420 patent, Defendants import improper and unsupported requirements into the claims.

First, Defendants assert that the wells and barriers must be "a few-monolayer[s]-thick." The term monolayer is used in neither the '420 patent nor its file history, and therefore, is not a proper basis to limit the claims. *Thorner*, 669 F.3d at 1365. In addition, the proposal will no doubt lead to additional disputes regarding the scope of the term "few-monolayers." Indeed, that construction appears to give little additional guidance to the fact finder regarding what falls with or is excluded from the claims. The construction, therefore, does not meet claim construction's primary purpose. *See Eon Corp. IP Holdings*, 815 F.3d at 1320.

And second, Defendants assert that the barriers in particular must be "thin enough that carriers <u>tunnel</u> through them."[2] Rather than being specifically limited to tunneling, the '420 patent envisions various forms of carrier movement through the barrier:

The <u>carrier path through the layer</u> 22 (FIGS. 3A and 3B) is composed of [1] <u>a diffusive lateral component</u> due to the high mobility of carriers in the lateral direction, [2] <u>barrier tunneling</u>, <u>and/or</u> [3] <u>penetration through conducting</u>

---

[2]      Tunneling is a well-known quantum-physics concept, where a particle with insufficient energy to exceed a potential barrier is able nonetheless to pass through. In classical mechanics, that passage would be impossible, but in quantum physics a particle is modeled as a wave function with a probability of appearing on the barrier's far side.

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO.: 18-CV-05195-LHK

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

1    channels in a direction normal to the semiconductor layer 22.

2    (Eisenberg Decl. Ex. 7 at 12:9-13.) In other words, rather than passing through the barrier, the

3    expressly claimed "higher conductive regions" can provide ordinary conduction through the

4    barrier. Here again, therefore, Defendants' construction seeks to import unnecessary limitations

5    that are neither required nor even supported by the intrinsic record.

6    **10.  "transparent regions" ('420 patent claims 1 and 13)**

| Claim Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "transparent regions" | Plain and ordinary meaning, or in the alternative "regions of the barrier that permit light at or near a target wavelength to pass through"[3] | Indefinite<br><br>In the alternative:<br><br>"distinct regions that have a transmission coefficient of at least 50% for a target wavelength" |

The parties appear to agree that the term "regions" requires no construction. In particular,

Defendants merely reuse that term in their alternative construction, suggesting that the jury can

apply that term directly. Instead, the focus of the parties' disagreement is the word "transparent."

SETi asserts that that no construction is necessary. In contrast, Defendants appears to assert that

unless a specific numerical range is applied, this term is indefinite.

The word "transparent" is a common and well-understood term that requires no express

construction. Simply put, light of the wavelength of interested is able to pass through the recited

regions. No more is implied or required by the relevant recitation. Support for this broad scope is

provided throughout the specification of the '420 patent. For example, in the Summary of the

Invention section, the inventors provided the following description:

> Aspects of the invention provide a device including one or more layers with
> lateral regions configured to facilitate the transmission of radiation through the
> layer and lateral regions configured to facilitate current flow through the layer.

---

[3]    To narrow the scope of the dispute, SETi's alternative construction adopts the "target wavelength" portion of Defendants' alternative proposal.

PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO.: 18-CV-05195-LHK

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

> The layer can comprise a short period superlattice, which includes barriers alternating with wells. In this case, the barriers can include both <u>transparent regions, which are configured to reduce an amount of radiation that is absorbed in the layer</u>, and higher conductive regions, which are configured to keep the Voltage drop across the layer within a desired range.

(Eisenberg Decl. Ex. 7 at 3:46-55.) The Detailed Description section provides a similar disclosure. (*Id.* at 5:58-6:1; *see also id.* at 7:4-8 (broadly using the terms "semi-transparent" and "transparent" as examples of the term "partially transparent").)

Rather than seek to identify the plain and ordinary meaning of the term "transparent," Defendants seek to import technical jargon and improperly impose a strict numerical limit. Both flaws require rejection of Defendants' proposal.

As to the form of Defendants' proposal, the proffered language renders the claim scope more rather than less clear. In particular, rather than jury-usable language, Defendants propose "hav[ing] a transmission coefficient of at least 50% for a target wavelength." This proposal fails claim construction's fundamental purpose, to "provide the jury with a clear understanding of the disputed claim scope." *Eon Corp. IP Holdings*, 815 F.3d at 1320.

As to the numerical limit, Defendants' position appears to be that unless a strict limit is imported from the specification into the claims, the disputed language is indefinite. Defendants' argument is contrary to law and inconsistent with the specification of the '420 patent.

The leading case on indefiniteness, *Nautilus*, acknowledged that claims must provide "clarity," but that "absolute precision is unattainable." 134 S.C. at 2129. As the Federal Circuit has subsequently acknowledged, "[t]he definiteness standard 'must allow for a modicum of uncertainty' to provide incentives for innovation, but must also require 'clear notice of what is claimed, thereby appris[ing] the public of what is still open to them.'" *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014) (citing *Nautilus*, 134 S. Ct. at 2128, 2129). Thus, a claim construction need not impose "numerical precision." *Exmark Mfg. Co. Inc. v. Briggs &*

- 22 -

1    *Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1346 (Fed. Cir. 2018); *see also One-E-Way, Inc.*

2    *v. Int'l Trade Comm'n,* 859 F.3d 1059, 1063 (Fed. Cir. 2017). Instead, the issue is whether the

3    scope is ascertainable to a person of ordinary skill in the art. *One-E-Way*, 859 F.3d at 1063.

4         Defendants cannot argue that the '420 patent lacks guidance regarding the term

5    transparent. To the contrary Defendants take an unambiguously exemplary disclosure from the

6    specification and import that disclosure into the claims. (Eisenberg Decl. Ex. 7 at 9:61-65 ("<u>In a</u>

7    <u>more particular embodiment</u>, the transparent regions comprise a transmission coefficient for

8    radiation of a target wavelength <u>higher than approximately fifty percent</u> (sixty percent in another

9    embodiment and eighty percent in a still more particular embodiment).").) That form of claim

10   construction is improper absent an express definition or disclaimer. *Thorner*, 669 F.3d at 1365.

11        Moreover, the specification expressly contemplates transmission coefficients significantly

12   below fifty percent. (*See* Eisenberg Decl. Ex. 7 at 7:21-40 (describing a transmission coefficient as

13   0.5%).) As discussed above, the breadth of the disclosure is confirmed by specification's

14   description of the terms "transparent" and "semi-transparent" as examples of the term "partially

15   transparent." (*Id.* at 7:6-7.) Instead of a specific quantification of transparency, the specification

16   focusses throughout on balancing the competing needs for conductivity and transparency. (*See*

17   Eisenberg Decl. Ex. 7  at 3:46-55; 5:58-6:1.) The claims, therefore, adequately reflect that

18   inventive concept by expressly reciting those characteristics of the different regions of the barrier.

19        Defendants' imposition of a 50% limit also runs afoul of the claim-differentiation doctrine.

20   That doctrine, presumes that dependent claims are "of narrower scope than the independent claims

21   from which they depend." *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir.

22   2003). Here, however, claim 7 expressly recites the limit that Defendants' seek to import into

23   independent claim 1: "[t]he device of claim 1, wherein the set of transparent regions have an

24   average transmission coefficient for radiation of a target wavelength of at least fifty percent."

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450

- 23 -

## III.     CONCLUSION

For the foregoing reasons, SETi requests the court adopt its proposed constructions and reject Defendants' constructions.

Dated: May 14, 2019

/s/ *Michael B. Eisenberg*

Stacey H. Wang (SBN 245195)
Vito Costanzo (SBN 132754)
HOLLAND & KNIGHT LLP
400 South Hope Street 8th Floor
Los Angeles, CA 90071-2040
Telephone: 213-896-2400
Facsimile: 213-896-2450
stacey.wang@hklaw.com
vito.costanzo@hklaw.com

Michael B. Eisenberg (admitted *pro hac vice*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: (212) 513-3529
Facsimile: (212) 385-9010
michael.eisenberg@hklaw.com

Jennifer L. Jonak (SBN 191323)
JONAK LAW GROUP, P.C.
2888 Arline Way Eugene, Oregon 97403
Telephone: (541) 525-9102
Facsimile: (541) 500-0882
jenny@jonak.com

Attorneys for Plaintiff,
SENSOR ELECTRONIC
TECHNOLOGY, INC.

Holland & Knight LLP
400 South Hope Street 8th Floor
Tel: 213.896.2400
Fax: 213.896.2450